[No. 33058.   Department Two.   June 16, 1955.]

CLARENCE M. KNIGHT, *as Guardian ad Litem of Robert Knight, a Minor, Appellant,* v. WANDERMERE COMPANY, *Respondent.*[1]

*R. Max Etter* and *Ellsworth I. Connelly,* for appellant.

*John D. MacGillivray* and *Willard W. Jones,* for respondent.

WEAVER, J.—Plaintiff appeals from a judgment dismissing his action for damages for personal injuries, entered after the trial court had sustained a challenge to the sufficiency of the evidence at the close of the case.

[1]Reported in 284 P. (2d) 1106.

Defendant is the owner and operator of a large public recreation area north of Spokane. Among its facilities is an artificial lake, covering approximately twelve acres, which is used for swimming. Adjacent to the bathhouse and attached to it is a boardwalk or dock.

At times, plaintiff had been employed by defendant as a lifeguard and in other capacities. He had used the swimming facilities on many occasions, over a period of five or six years, and was thoroughly familiar with them.

August 30, 1953, he paid his admission fee, changed into swimming trunks in the bathhouse, and made a running dive from the dock into about four feet of water. He hit the bottom, as he had done on other occasions.

Plaintiff "caught himself" with his hands when he hit bottom. He thought he had sprained or broken his wrist. He got out of the water and discovered his wrist was cut. The attending physician testified that, in his opinion, the cut was made by some "relatively sharp object," other than a rock.

Plaintiff's complaint alleges that the defendant

". . . negligently, carelessly, recklessly and wrongfully permitted and caused to remain protruding from the bottom of said lake area, . . . a very sharp and jagged article."

▇ The proprietor of a place of public amusement is not an insurer of the safety of his patrons, but is under the duty of maintaining his premises in a reasonably safe condition. *Hendrickson v. Brill*, 45 Wn. (2d) 766, 278 P. (2d) 315 (1954).

▇ We agree with counsel that the disposition of this case is dependent upon the application of the rule announced in *Leek v. Tacoma Baseball Club*, 38 Wn. (2d) 362, 365, 229 P. (2d) 329 (1951):

"Generally speaking, the possessor of land is liable for injuries to a business visitor caused by a condition encountered on the premises *only* if he (a) knows or should have known of such condition and that it involved an unreasonable risk; (b) has no reason to believe that the visitor will

discover the condition or realize the risk; and (c) fails to make the condition reasonably safe or to warn the visitor so that the latter may avoid the harm. [Citing authorities.]" (Italics ours.)

The duty to use care is predicated upon knowledge, actual or imputed, of the danger. *Leek v. Tacoma Baseball Club, supra.*

Although two searches were made immediately following the accident, and another search was made sometime later, when the artificial lake was drained, the "sharp and jagged article" was never found. There is no evidence as to the nature of the object; no evidence of actual knowledge on the part of defendant of its existence; and no evidence that the condition complained of had existed for such a time that the defendant was afforded an opportunity to discover and remove the danger.

Plaintiff argues that, although there is no evidence that defendant had actual notice of the particular object creating the danger that resulted in the injury, the facts are sufficient to take the case to the jury, because defendant had knowledge of a generally dangerous condition applying to the entire premises. In support of this argument, plaintiff relies upon *Markman v. Fred P. Bell Stores Co.,* 285 Pa. 378, 132 Atl. 178, 43 A. L. R. 862 (1926); *Kalb v. Fisher,* 5 N. J. Misc. 977, 139 Atl. 237 (1927), affirmed 105 N. J. L. 491, 144 Atl. 919 (1929); *Randolph v. Great Atlantic & Pac. Tea Co.,* 2 F. Supp. 462 (D. C. Pa.; 1932), affirmed 64 F. (2d) 247 (C. C. A. 3d; 1933); *S. S. Kresge Co. v. Rankin,* 149 F. (2d) 934 (C. C. A. 4th; 1945).

We have no quarrel with the rule announced in these cases, but a careful reading of them discloses that it is not applicable to the facts of this case.

In the *Markman* case, *supra,* the dangerous condition of the floor was not a mere chance occurrence, but was so often repeated that it was frequently called to the notice of the owner and, on one occasion, to the attention of the police. In the *Kalb* case, *supra,* the proof showed that the sidewalk in front of defendant's store was

" . . . habitually littered with lettuce and other vegetable refuse and that the defendant was on a number of occasions notified by the street cleaners and city inspectors to abate the condition."

In the *Randolph* case, *supra*, scraps of bone and meat were left almost continuously on the floor where plaintiff fell and was injured. This condition had existed for several months. In the *Kresge* case, *supra*, the injury resulted from the littered condition of the floor. It was not an isolated or unexpected happening but was the usual, continuous, and foreseen result, incident to the manner in which defendant conducted its lunch-counter business. The *rationale* of these cases is that the dangerous condition of the premises may be so habitual, customary, and usual that it warrants an inference that the defendant had actual or constructive notice thereof.

*Maehlman v. Reuben Realty Co.*, 32 Ohio App. 54, 166 N. E. 920 (1928), cited by plaintiff, is distinguishable. A short time before plaintiff stepped upon a broken bottle and cut his foot, at a point twelve feet from shore and in one and one half feet of water; broken bottles were found on defendant's beach. No attempt had been made by defendant, despite the presence of the broken bottles on the beach, to search under the water, in the immediate vicinity, for additional broken glass. Under these facts, the court properly held the defendant's negligence to be a question for the jury, on the ground that finding broken bottles upon the beach indicated a probability that some broken glass might have gotten into the water adjacent thereto.

Daily inspections and policing of the premises by defendant's employees do not constitute notice that a dangerous condition existed. Such inspections and care, exercised by defendant, are evidence only of good management and of defendant's attempt to discharge the duty to maintain the premises in a reasonably safe condition. It is true that, on occasions, cans, bottles, and other objects, thrown into the lake and onto the beach, were removed, and that an occasional swimmer cut his foot; but this evidence falls

short of establishing a dangerous condition that was habitual and customary, so that it can be said that defendant had constructive notice of that which caused plaintiff's injury.

The mere presence of such refuse does not of itself show negligence, for such condition may arise temporarily in any swimming facility, even though the proprietor has exercised due care. Mere isolated incidents of cans and bottles upon the beach and in the water are probative of nothing. We agree with the trial court, there is no evidence from which it can be inferred that defendant had constructive notice that a dangerous condition existed. *Mathis v. H. S. Kress Co.*, 38 Wn. (2d) 845, 232 P. (2d) 921 (1951); *Beverly Beach Club v. Marron*, 172 Md. 471, 192 Atl. 278 (1937); *Johnson v. Bauer*, 292 Mass. 534, 198 N. E. 739 (1935); *Bader v. Great Atlantic & Pac. Tea Co.*, 112 N. J. L. 241, 169 Atl. 687 (1934); *Penny v. Sears, Roebuck & Co.*, 193 Minn. 65, 258 N. W. 522 (1934).

The judgment is affirmed.

HAMLEY, C. J., MALLERY, and HILL, JJ., concur.

ROSELLINI, J. (dissenting)—Appellant suffered the injury to his wrist under the circumstances set forth in the majority opinion. The doctor testified the appellant suffered the loss of the tendon power of the thumb, loss of flexion of thumb, and loss of flexion of the index and middle fingers. In addition, he had complete paralysis of the median nerve, which nerve supplies sensation to the surface of the thumb, index finger, and each of the ring fingers, and at the time of the trial his disability was around thirty per cent of the hand.

This appeal raises the question whether the court erred in granting respondent's motion to dismiss the appellant's complaint at the end of the respondent's case for the reason that the evidence failed to prove that respondent was negligent.

The evidence disclosed that the Wandermere Company, a Washington corporation, owns about three hundred seventy-five acres of land in Spokane county, almost all of

which is devoted to various recreational facilities. The respondent corporation operates a golf course, a ski jump hill, a picnic grounds, a clubhouse, a bathhouse, and an artificial lake for swimming.

This lake was susceptible to being drained, and according to the respondent's manager was, in fact, 'drained each fall. The lake bottom was composed of clay with an overburden of sand in the general vicinity of the beach adjacent to the bathhouse where the injury occurred. Accordingly, in the early morning hours when the ripple on the water was not too pronounced, one could see the bottom fairly clearly from the bathhouse boardwalk out a distance of fifteen to twenty feet. On the other hand as the day wore on and the swimmers stirred up the water, it became impossible to see any object on the bottom of the lake. Mr. Ross, respondent's manager, stated that in the fall of 1952 and the spring of 1953, the lake was drained and cleaned, and further testified:

"We take all the weeds, rocks, cans, glass, bottles, cans—anything else people might have thrown in there during the winter and summer season . . . out, [and respondent's] life guard . . . picks up all the cans and bottles, or sticks of wood, or anything that might be thrown in at the beach or the bath house itself."

William Stillwell, an employee of respondent, stated that he had seen people throwing bottles into the water in front of the bathhouse and had himself picked up bottles and glass on the beach area during the summer of 1953, and further that quite often, about twice a week during the swimming season, he had given first aid to swimmers who had cut their feet while in the water and had reported these accidents to the manager of the bathhouse, Mrs. Morin.

Clarence Ripley, another employee of respondent's, testified that quite a problem was created by trespassers holding parties at Wandermere late at night and throwing bottles and other debris into the lake at the swimming area.

John Anderson, still another employee of the respondent, testified that he started working for respondent in March, 1953, and was still so employed at the time of the trial. That at the time the lake was partially drained in 1953, he and

others "picked up bottles and cans, or whatever we could
find out there as far as we could go without getting into the
water."

Lawrence Baskett, respondent's lifeguard during the time
in question, testified that he recalled an instance when a
bottle was broken in the immediate vicinity of the bath-
house promenade; that occasionally he saw glass, broken
bottles, and tin cans in the same area.

And Clifford Akers testified that, sometime between the
4th of July and the 30th of August, 1953, he suffered a cut
on his toe from what he believed was a piece of glass while
wading in the water in front of the bathhouse, and that Mrs.
Morin administered first aid to him.

Mrs. Morin's testimony was particularly directed toward
describing the way in which respondent attempted to make
the dangerous condition reasonably safe. Her effort echoed
the testimony of all the witnesses who described the method
used by respondent to keep the lake bottom in the beach
area free from dangerous objects when she stated as follows,
in answer to questions put to her by counsel for appellant:

"Q. Were you ever advised or instructed, or was there any
kind of an operating administrative rule in effect with re-
spect to an inspection of the bottom of the beach in any cer-
tain distance to the right of the bathhouse, left of the bath-
house, or in front of the bathhouse? A. Mr. Ross told me
that I was to see that it was kept clean over the entire area,
and to see that the boys did keep it picked up. Q. I have
reference to the water area—out in the water. A. If there
was anything out there that they could see, they were sup-
posed to pick it up. Q. How far out were they supposed to
check to see if there was anything out there, and if there was,
to pick it up? A. As far out as there was anything in the
lake anywhere. Q. How did you determine that, yourself?
What procedure did you used to follow—just by looking
out? A. Yes, just by looking out. Q. And sending the young-
sters out if you saw something? A. Yes. Q. And on occasions
did they bring bottles in? A. Yes. Q. During the 1953 sea-
son? A. Yes. Q. Did the boys ever bring any glass to you?
A. Yes, on occasion they did—broken bottles. Q. Out of that
area? A. Yes. Q. Those are the ones that you could observe?
You would send them out to pick them up? A. Yes. Q. Do

you recall whether the bottom of the water out there was ever raked in any fashion? A. While there was water in the lake? Q. Yes. A. Right in front of the beach it is about three and a half feet deep. You can't rake in three feet of water. Q. I am just asking whether you did or didn't. A. Not that I know of; not while there was water in the lake. Q. The way you attempted to keep it clean was by observation only —by observing and looking down in the water to see if you could see anything? A. And sending some one out to do it."

The evidence, briefly outlined above, established that respondent had knowledge of the dangerous condition of the premises; or, in the alternative, if the respondent was given the benefit of every inference and the evidence was considered in the light most favorable to the respondent, it was for the jury to determine whether respondent had constructive notice that a dangerous condition existed. It was also for the jury to determine whether the precautions and the methods adopted by the respondent would make the premises reasonably safe for the users thereof. Under the circumstances, the judgment of dismissal of the plaintiff's complaint was reversible error, and the matter should be remanded with instructions to grant the appellant a new trial.